Dr. T. J. Ramírez Cuerda, demandante-apelado-apelante, *v.* Angel María Yumet Méndez, demandado-apelante-apelado.

No. 4798.—*Sometido:* Febrero 6, 1930. *Resuelto:* Julio 7, 1931.

*A. García Ducós,* abogado del apelante; *J. Alemañy Sosa,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR ALDREY, emitió la opinión del tribunal.

El Dr. T. J. Ramírez Cuerda demandó a don Angel María Yumet Méndez para que le pagase la cantidad de $5,000 como valor razonable de los servicios médicos que le prestó. Dictada sentencia condenatoria por la cantidad de $1,500 con los intereses legales desde la interposición de la demanda y sin especial condena de costas, interpuso el demandado esta apelación.

La cuestión fundamental en este recurso es que la cantidad de $1,500 concedida por la corte inferior como valor razonable de los servicios del demandante es excesiva y debe ser rebajada a $350 que el apelante estima justo y que ofreció pagar en su contestación a la demanda.

Resulta de la prueba que don Angel María Yumet Méndez, que vive en Aguadilla, enfermó el 4 de marzo de 1927 de tonsilitis o absceso peritonsilar según su médico el Dr.

Igartúa, mejorando poco después, a tal punto que por tres o cuatro días salió a la calle, pero después volvió a ponerse malo y su médico encontró entonces un estado de edema de las bases de los pulmones, teniendo una enorme cantidad de albúmina, sangre y cilindros en la orina por lo que su diagnóstico entonces fué de nefritis secundaria a la tonsilitis o absceso peritonsilar. En 22 de marzo hubo una consulta con el Dr. Biamón, de San Juan, quien estuvo de acuerdo con el diagnóstico y con el tratamiento del médico de cabecera Dr. Igartúa, pero el enfermo siguió agravándose y el 27 de marzo en ocasión de estar en Aguadilla los doctores Biamón y González Martínez, de San Juan, y habiendo sido llamado el Dr. Torregrosa, tuvo lugar otra consulta y todos ellos estuvieron conformes con el diagnóstico de nefritis aguda secundaria a la tonsilitis. El día 30 de marzo fué llamado en consulta el demandante, que ejerce su profesión en Mayagüez, donde tiene una clínica, y tuvo lugar otra consulta entre los Drs. Ramírez Cuerda, Igartúa, Zamora y Cardona, en la que después de la información del caso y reconocimiento del paciente opinó Ramírez Cuerda que el enfermo tenía difteria, con cuyo parecer no estuvieron conformes los otros tres médicos de la consulta, acordando entonces que para comprobarlo se enviase al laboratorio de San Juan el exudado de la garganta, como se hizo, contestando al día siguiente por la tarde dicho laboratorio por telegrama que era un caso positivo de difteria. En vista de ese informe le fué aplicado suero antidiftérico al paciente. Dos días después fué otra vez el Dr. Ramírez Cuerda a Aguadilla, requerido por la familia del Sr. Yumet, encontró mejor al enfermo y se le aplicó más cantidad de suero y se le pusieron inyecciones de suero glucosado. El 5 de abril volvieron a llamar al Dr. Ramírez Cuerda porque el enfermo se había agravado y fué a Aguadilla donde lo visitó con el Dr. Igartúa, encontrando disminución en la orina y síntomas eurémicos causados por tóxicos de la vacuna antidiftérica,

por lo que propuso una sangría o felbotomía con la que estuvo conforme el Dr. Igartúa, pero por cuestión de diferencia con los otros médicos, Cardona y Zamora, no se hizo la sangría y fué llamado el Dr. Susoni, de Arecibo, quien fué y estuvo conforme con que se hiciera la flebotomía, la que no se practicó en seguida por la gravedad del enfermo y hubo que esperar algunas horas para hacerla, hasta las once de la noche, cuando el enfermo tuvo alguna reacción favorable, y por la madrugada el paciente empezó a mejorar. Nueve días después volvió el demandante a Aguadilla a requerimiento de la familia, y con el Dr. Igartúa fué declarado el estado de convalecencia del enfermo y no volvió más. En esas visitas el Dr. Ramírez Cuerda tuvo necesidad de permanecer por muchas horas en Aguadilla. Según el Dr. Igartúa el paciente nunca tuvo difteria y las inyecciones puestas para ella lo agravaron. Se admitió que los doctores Zamora y Cardona declararían como el Dr. Igartúa.

El Dr. Ramírez Cuerda declaró en la corte y a presencia de varios médicos que luego testificaron, en qué consistieron los servicios que prestó al Sr. Yumet, y teniendo en cuenta esa declaración manifestaron los Drs. Montalvo Guenard y Frank O. Rivera, que a su juicio tales servicios valen $10,000. Los Drs. Blanes y Casalduc los valoraron en $5,000. Los Drs. Igartúa, Biamón y Susoni, presentados por el demandado, no declararon cuál es el valor razonable de los servicios del demandante.

Nuestro Código Civil en su artículo 1846 concede a los profesionales, cuando no existe contrato de servicios, el derecho de reclamar y obtener el importe razonable de ellos. Para su valoración se puede tener en cuenta además de los servicios mismos, la naturaleza y dificultad del caso, la reputación profesional del demandante, su experiencia como médico y aun la situación económica del demandado, aunque sobre este extremo hay gran conflicto en las decisiones de los tribunales. 48 Corpus Juris 1167. Sobre dichos elemen-

tos se dice en Wharton & Stillés' Medical Jurisprudence, tomo 3, pág. 472, lo siguiente:

"Un médico que presta servicios profesionales a otra persona, sin mediar un convenio específico respecto a la compensación, debe cobrar, si a ello tiene derecho, a base de *quantum meruit;* siendo el valor a probar el precio ordinario y razonable de servicios de esa índole. Y a esto él tiene derecho cuando no se demuestra específicamente falta de habilidad, aunque él incurriera en error en el curso del tratamiento, y a pesar de que no lograse realizar aquello para que se utilizó. En tal caso, sin embargo, un facultativo sólo puede cobrar el valor razonable de los servicios que prestó; y el valor de los servicios de un médico no puede medirse, como materia de derecho, por el promedio diario de sus ingresos; en tales casos el jurado debe tomar en consideración todos los varios elementos, y derivar su propia conclusión acerca del importe por comparación. Y lo razonable de lo que cobre un médico por sus servicios no puede determinarse mediante comparación con otros cobros hechos por él en casos similares.

 \* \* \* \* \* \* \*

"La norma de compensación de los médicos y cirujanos se rige hasta cierto punto por su reputación y habilidad en la profesión, la seriedad del caso, los servicios prestados, y la responsabilidad general y éxito de aquéllos." Lange v. Kearney, 21 N. Y. S. R. 262, 4 N. Y. Supp. 14.

Teniendo en cuenta lo expuesto y la prueba no controvertida del demandante respecto al valor razonable de los servicios que reclama, opinamos que no es excesiva la cantidad que fijó la corte inferior en este caso.

 Otras varias cuestiones secundarias ha propuesto el apelante en su alegato. La negativa de eliminación de ciertos particulares de la demanda y la excepción de que ella no aduce hechos determinantes de causa de acción fueron propiamente resueltas. Los motivos 4, 5 y 6 referentes al éxito obtenido por el demandante no existen, pues tal éxito es elemento a tenerse en cuenta en la valoración de los servicios médicos. Con respecto al séptimo y octavo por haber sido admitida prueba respecto a la situación económica del demandado, aun no siendo admisible, lo que no resolvemos,

no ha causado perjuicio al apelante pues a pesar de haber declarado algunos de los médicos que presentó que los servicios valían los $5,000 reclamados y otros que valían mucho más, la corte fijó la cuantía en $1,500. El décimo tampoco es sostenible porque el Dr. Francisco J. Casalduc está capacitado para valorar los servicios del demandante aunque no trabaje en Aguadilla. Y el undécimo y último porque habiendo ganado el demandante su pleito no se le debían imponer las costas.

*La sentencia apelada debe ser confirmada.*